UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

In re:                                              Chapter 7

Abdul Rauf and Salmi Rauf,                          Case No. 12-67060

      Debtors.                                      Hon. Phillip J. Shefferly

_____/

Wildwood Property, L.L.C.,                          Adversary Proceeding
                                                    No. 13-04260-PJS
      Plaintiff,

v.

Abdul Rauf,

      Defendant.

_____/

**OPINION DENYING DETERMINATION OF NON-DISCHARGEABLE DEBT AFTER TRIAL**

**Introduction**

    This matter is before the Court upon a complaint filed by Wildwood Property, L.L.C.

("Wildwood") against the Debtor, Abdul Rauf ("Debtor") seeking a determination that a debt owed

by the Debtor to Wildwood is non-dischargeable. The Court has subject matter jurisdiction over this

adversary proceeding under 28 U.S.C. §§ 1334(b), 157(a) and 157(b)(1) and (2)(I). For the reasons

explained in this opinion, the Court denies Wildwood's request for a determination of non-

dischargeability.

**Procedural History**

    The Debtor filed this Chapter 7 bankruptcy case on December 14, 2012. On March 6, 2013,

Wildwood filed this adversary proceeding. Wildwood's complaint contains two counts. Count I

seeks a determination of a non-dischargeable debt under § 523(a)(2)(A) of the Bankruptcy Code. Count II seeks a determination of a non-dischargeable debt under § 523(a)(2)(B) of the Bankruptcy Code.

After discovery was completed, Wildwood filed a motion for summary judgment on both counts on September 30, 2013. The Debtor timely filed a response. On November 8, 2013, the Court heard Wildwood's motion. At the conclusion of the hearing, the Court granted Wildwood's motion in part and denied it in part. As for count I, the Court found that there were no genuine issues of material fact with respect to two elements of § 523(a)(2)(A): the Debtor obtained money, property, services or credit from Wildwood, and the Debtor did so through a material misrepresentation. However, the Court found that there were genuine issues of material fact with respect to four other elements of § 523(a)(2)(A): (i) whether the Debtor knew that the misrepresentation that he made was false or that he made the misrepresentation with gross recklessness as to its truth; (ii) whether the Debtor intended to deceive Wildwood; (iii) whether Wildwood justifiably relied on the Debtor's misrepresentation; and (iv) whether Wildwood's reliance was the proximate cause of its loss.

The Court also granted Wildwood a partial summary judgment with respect to count II of its complaint under § 523(a)(2)(B). The Court found that there were no genuine issues of material fact with respect to two elements of § 523(a)(2)(B): the Debtor used a written statement that was materially false, and the written statement pertained to the Debtor's financial condition. However, the Court found that there were genuine issues of material fact with respect to two other elements of § 523(a)(2)(B): (i) whether Wildwood reasonably relied upon the false written statement

-2-

regarding the Debtor's financial condition; and (ii) whether the Debtor intended to deceive Wildwood.

On November 25, 2013, the Court held a joint final pretrial conference. Based upon the stipulation of Wildwood and the Debtor, as well as the rulings made by the Court at the final pretrial conference, the Court entered a joint final pretrial order on December 2, 2013. In the joint final pretrial order, both Wildwood and the Debtor identified the witnesses they intended to call at the trial, the exhibits they intended to introduce, and the legal authorities that supported their respective positions.

On December 18, 2013, the Court conducted the trial. Wildwood called four witnesses: George Nyman, a principal of Wildwood; Adam Nyman, an employee of a property management company owned by George Nyman; the Debtor; and Shahid Tahir, a former friend and business associate of the Debtor. Wildwood introduced into evidence exhibits 1-14. The Debtor called himself as his only witness. The Debtor introduced into evidence exhibits B, C, I, J, K, L, M, N, Q and R.[1] At the conclusion of the trial, the Court took the matter under advisement. The following are the Court's findings of fact and conclusions of law pursuant to Fed. R. Bankr. P. 7052.

## **Findings of Fact**

The Debtor is a 59 year old individual who was born overseas but has lived in the United States for about the last 30 years. The Debtor obtained a degree in engineering in Manchester, England. The Debtor has been employed by Chrysler for over 25 years, and is presently a corporate quality engineer. The Debtor has a stable job with a six figure income. The Debtor is married, and

---

[1] In the interest of clarity of the record, the Court entered an order on December 21, 2013 (ECF No. 47) identifying by number, letter and name, each exhibit that it admitted at the trial.

for the past 14 years has lived at 2088 Rookery Drive, in Rochester Hills, Michigan ("Debtor's Home").

Although the precise date is not clear from the record, the Debtor at some point wanted to get into the restaurant business. Sometime in 2010, the Debtor and his wife, Salmi Rauf, got involved in a restaurant venture with another couple, Shahid Tahir, and his wife, Huma Shahid. Like the Debtor, Tahir had a job that was not in the restaurant business. He was a physical therapist who worked for his brother's company. Initially, the two couples got involved in operating a small food kiosk. Eventually they planned to open restaurants. They created an entity by the name of International Fusion, LLC ("Fusion"). The Operating Agreement ("Operating Agreement") for Fusion, dated August 19, 2010 (exhibit 10), identifies only two limited liability company members: Huma Shahid and Salmi Rauf, the two wives. Neither the Debtor nor Tahir were named as members of the limited liability company. The Operating Agreement listed the Debtor's Home as the business address for Fusion, and stated that Fusion would operate under the assumed name of Thai Masala. The Operating Agreement further stated that Fusion would be capitalized by "an amount between $25,000 and $50,000 to be determined by the Members . . . ." The Operating Agreement does not provide for either Tahir or the Debtor to act on behalf of Fusion in any capacity. Although not specified in writing, the thinking was that Tahir and his wife would be "silent partners," and the Debtor and his wife would handle running the restaurants for Fusion.

In early November, 2010, Fusion opened a restaurant at Great Lakes Crossing, a shopping center owned by the Taubman Company ("Taubman"), a nationally recognized shopping mall owner and operator. The restaurant at Great Lakes Crossing was known as Thai Masala. Although the Debtor was not a member of Fusion, the Debtor was involved in the negotiations with Taubman for

-4-

the lease for Thai Masala, as evidenced by correspondence between the Debtor and Taubman in September, 2010 (exhibit J).

During the same time that the Debtor was negotiating a lease for Thai Masala with Great Lakes Crossing, the Debtor also began negotiating a lease for a restaurant to be opened in a 182,000 square foot shopping center located on Ford Road in Westland, Michigan, owned by Wildwood. George Nyman is the owner of Wildwood. George Nyman is also a broker, builder and property manager who has been in the real estate business since 1970. In addition to his interest in Wildwood, he is also an owner of Professional Property Management Company ("Professional Property"), a property management company that he opened in 1975 that manages apartments, shopping centers and office buildings for entities that he has an interest in. He is the ultimate decision maker both for Professional Property and for Wildwood. His son, Adam Nyman, also works for Professional Property.

Professional Property uses various real estate brokers to obtain tenants for the properties that it manages. Typically, a broker finds a prospective tenant for one of the properties managed by Professional Property. The broker then prepares a letter of intent, which the broker then reviews with the prospective tenant. If a letter of intent proceeds to a lease, negotiations for the lease are then conducted either by the attorneys for the tenant and Professional Property, or by their principals. The level of information required by Professional Property for new tenants varies depending upon the nature of the prospective tenant. For a large, well recognized national tenant, less documentation is required. For a regional tenant, more documentation is required, but still more documentation is required for a local tenant. If the local tenant is a start-up business or a "mom and

pop" operation, Professional Property ordinarily requests a business plan, personal guaranties and personal financial statements.

Sometime in 2010, the Debtor began discussions with Gaven LaKritz, a real estate broker used by Professional Property. The Debtor was interested in having Fusion open an Indian restaurant in Wildwood's shopping center. LaKritz provided the Debtor with the necessary paperwork. One of the papers provided by LaKritz to the Debtor was an Application for Tenancy ("Application") (exhibit 3). The Application is a form that Professional Property uses. It consists of three pages and requires various information. Among other things, the first page asks for the applicant's name, nature of business, home and business addresses, and proposed use of the premises. The second page asks for information regarding assets and liabilities. The third page asks for credit references, mortgage companies and credit cards.

The Debtor filled out the Application with help from LaKritz. On the first page, in handwriting, the Application says that the applicant is "Abdul Rauf," and then lists the Debtor's home address and his birth date. It then identifies Fusion as the "Name of Business (To be on Lease)." The Application also indicates that the "Proposed Use" is "Indian Restaurant" under the name of "Tandoor." Below that line is a section, again filled out in handwriting, that indicates a "Date of Incorporation" of "08/10" and a "State of Incorporation" of "MI."

On the second page of the Application, there is a listing of assets, liabilities and net worth. The form does not specifically state whether this information is requested with respect to the prospective tenant or with respect to a principal or personal guarantor for the tenant. Some of the lines for assets were left blank, but others were completed in handwriting. The following lines for assets were completed with the figures handwritten by the Debtor:

| | | |
|---|---|---|
| Cash on hand (unrestricted in banks) | $ | 250,000 |
| Home - Fair Market Value | $ | 650,000 |
| Life Insurance (cash surrender value) | $ | $1.5 million |
| Other Stocks and Bonds | $ | 200,000 |

There are lines for liabilities and net worth as well. Some of these lines were left blank, but others were completed in the Debtor's handwriting. The liabilities and net worth section contains the following information:

| | | |
|---|---|---|
| Notes Payable to Banks | $ | |
| Notes Payable to Others | $ | 78,000 |
| Mortgages Payable on Real Estate | $ | 285,000 |
| Total Liabilities | $ | 363,000 |
| Total Assets Minus Liabilities | $ | (2,600,000 - 363,000) |
| TOTAL NET WORTH | $ | 2,337,000 |

On the third page of the Application, although there are spaces to provide information regarding credit references, mortgage companies, car loans and credit cards, the only line filled out shows "Bank of America," but without an amount, under "Credit Card(s)." The bottom of the third page of the Application contains the following printed statement followed by a signature block:

Applicant acknowledges that submission of this Information does not constitute an option or offer to lease but merely represents some of our understandings about a possible future lease and is not intended to create a legally binding obligation on the part of either party. Such an obligation will be created only when both parties execute a formal lease which is then delivered by and between Landlord and Tenant. If a formal lease is not signed, neither party will be liable to the other under this information, nor as a result of any preliminary negotiation.

The Debtor signed his name underneath this printed statement.

As for the assets shown on the Application, neither the Debtor nor Fusion actually had $250,000 in cash. The Debtor provided this figure based on his understanding from his discussions with Tahir about the amount of money Tahir would eventually make available for Fusion to fund restaurants. Tahir himself did not have $250,000, nor did he ever commit to put $250,000 into Fusion, but he did provide the money for Fusion to open Thai Masala.

The home that was listed on the Application was the Debtor's Home. The Debtor estimated the fair market value of the home at $650,000 based on his impression that property values had gone up in his neighborhood recently because of some sales in his neighborhood that he had heard about, and its proximity to Chrysler headquarters. However, at the time that the Debtor filled out the Application, the only appraisal he had in his possession with respect to the Debtor's Home was an appraisal (exhibit 12) dated April 9, 2009 that showed a value of $365,000. The Debtor had no documentation to support the $650,000 figure for fair market value listed on the Application.

At the time that the Debtor filled out the Application, the Debtor also did not have life insurance with a cash surrender value of $1.5 million, nor did Fusion. The only insurance that the Debtor had an interest in at that time at all was a life insurance policy (exhibit R) provided to him by Chrysler, his employer, that had zero cash surrender value, but provided a "Voluntary Group Accident" benefit of $1 million and an "Optional Group Life Salaried Benefit" of $424,000.

As for the $200,000 of "Other Stocks and Bond" listed on the Application, the Debtor did have a 401(k) account through Chrysler that had a value approximating that sum. As of March 31, 2011, just a few months after the Debtor signed the Application, his 401(k) plan had a value of $190,585.94 (exhibit Q).

On October 8, 2010, LaKritz sent an email (exhibit 5) to George Nyman and Adam Nyman accompanied by a proposed letter of intent and "financial information for my Indian Restaurant user." Although the "financial information" was not specifically described in the email, it was the Application. George Nyman recalled receiving the Application, although he did not recall when he did so. Neither George Nyman nor Adam Nyman ever discussed the Application with the Debtor.

George Nyman decided that Wildwood would enter into a lease with Fusion. In reaching this decision, there were a number of facts that were important to him, but three of which were especially important. First, the Debtor had a high paying job with Chrysler. Second, Fusion already had a restaurant in Great Lakes Crossing. Third, there was $250,000 of cash, not much debt, and $2.3 million net worth on the Application.

It was not a hard decision for Wildwood to enter into a lease with Fusion. George Nyman felt it was unnecessary to have a business plan for Fusion, since Fusion was already operating a restaurant in a shopping center owned by Taubman. George Nyman did not know how long Thai Masala had been in business, and he did not ever go out to see that restaurant at Great Lakes Crossing. Instead, he relied solely on the information he received from LaKritz and the fact that Taubman had "vetted this guy," referring to the Thai Masala restaurant at Great Lakes Crossing. George Nyman would ordinarily be concerned if a prospective tenant had no financial statement, but here, even though the Debtor did not have such a statement, the Application served as a substitute. Despite the fact that they never spoke to the Debtor about the Application, both George Nyman and Adam Nyman understood that the assets listed on the Application were the personal assets of the Debtor since it was the Debtor who signed the Application.

-9-

On October 27, 2010, the Debtor signed a Letter of Intent ("Letter of Intent") (exhibit B). Subsequently, a Lease ("Lease") dated October 29, 2010 (exhibit 1) was entered into between Wildwood, as the Landlord, and Fusion, as the tenant. Despite the date on the Lease, it was not signed until sometime later. The Debtor signed it on November 22, 2010. The statement by the notary for the Debtor's signature indicates that the Debtor "did say that he is authorized member of Abdul Rauf d/b/a International Fusion an LLC, the company named in" the Lease, and further describes him as an "Authorized Member" of "Abdul Raul d/b/a International Fusion, LLC." The Debtor's signature also appears on a number of other pages of the Lease with the same indication of capacity on each page. On November 29, 2010, George Nyman signed the Lease on behalf of Wildwood as a "Member of Wildwood." Based upon his signature on the Lease, George Nyman and Adam Nyman both understood that the Debtor was a member of Fusion and was authorized to execute the Lease on behalf of Fusion.

At the same time that he signed the Lease, the Debtor and Salmi Rauf also signed a Personal Guaranty ("Personal Guaranty") (exhibit 2) of the Lease. Like the Lease, the Personal Guaranty was dated October 29, 2010, but was not signed by the Debtor and his wife until November 22, 2010.

Although the Debtor signed the Lease as an "Authorized Member," the Debtor knew that the Operating Agreement did not specifically identify him as a member. Nevertheless, based upon his discussions with Tahir, and the understanding that the Debtor and his wife had reached with Tahir and his wife, the Debtor believed that he had the authority to sign the Lease on behalf of Fusion. That belief was based not on any written documents, but rather was based solely upon the Debtor's discussions with Tahir and the Debtor's own conduct consistent with those discussions.

-10-

Unfortunately, Fusion never opened a restaurant at Wildwood. The Debtor ran into problems on two fronts. First, disagreements developed between Tahir and his wife, on the one hand, and the Debtor and his wife, on the other hand, regarding the operation of the Thai Masala restaurant at Great Lakes Crossing. Second, disputes arose between the Debtor and Wildwood regarding the proposed restaurant to be opened by Fusion in the Wildwood shopping center. Tahir sued the Debtor in state court. Wildwood also began its own litigation. First, it brought an eviction action against Fusion and obtained a judgment for possession in June, 2011. Second, on June 22, 2011, Wildwood sued the Debtor, the Debtor's wife and Fusion in Oakland County Circuit Court. Wildwood's complaint (exhibit 6) in Oakland County Circuit Court contained a number of counts, including a count against Fusion for breach of lease and unpaid rents, a count against the Debtor and his wife for breach of the Personal Guaranty, and a count against the Debtor for fraud and misrepresentation based upon the fact that the Debtor was not an authorized member of Fusion.

On September 28, 2012, the Oakland County Circuit Court issued an Order and Opinion ("State Court Opinion") (exhibit 7). The State Court Opinion granted summary disposition in favor of Wildwood and against the Debtor and his wife on the Personal Guaranty. The State Court Opinion did not make any ruling with respect to the allegations of fraud that were made by Wildwood. On October 10, 2012, the Oakland County Circuit Court entered an Order Granting Judgment Against Defendants Abdul Rauf and Salmi Rauf (exhibit 8), pursuant to the State Court Opinion, in the amount of $237,350.79. On the same day, the Oakland County Circuit Court also entered a Consent Judgment ("Judgment") (exhibit 9) that resolved all remaining issues in the lawsuit by dismissing the fraud count in the complaint without prejudice, and by dismissing all the

other counts in the complaint with prejudice. The Judgment states that it "resolves the last pending claim and closes the case."

## Conclusions of Law

### Section 523(a)(2)(A)

In count I, Wildwood seeks a non-dischargeable debt under § 523(a)(2)(A). Section 523(a)(2)(A) provides that a debt is not discharged in a Chapter 7 case if it is

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by–

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition[.]

In order for a debt to be held non-dischargeable under § 523(a)(2)(A), the creditor must prove each of the following elements:

(1) the debtor obtained money[, property, services, or credit; (2)] through a material misrepresentation[; (3)] that, at the time, the debtor knew was false or made with gross recklessness as to its truth; [(4)] the debtor intended to deceive the creditor; [(5)] the creditor justifiably relied on the false representation; and [(6)] its reliance was the proximate cause of loss. In order to except a debt from discharge, a creditor must prove each of these elements by a preponderance of the evidence. Further, exceptions to discharge are to be strictly construed against the creditor.

Rembert v. AT & T Universal Card Services, Inc. (In re Rembert), 141 F.3d 277, 280-81 (6th Cir. 1998) (citing Grogan v. Garner, 498 U.S. 279, 291 (1991)) (other citations omitted). "[T]he standard of proof for the dischargeability exceptions in 11 U.S.C. § 523(a) is the ordinary preponderance-of-the-evidence standard." Grogan v. Garner, 498 U.S. 279, 291 (1991). "In order to except a debt from discharge, a creditor must prove each of these elements by a preponderance of the evidence. Further, exceptions to discharge are to be strictly construed against the creditor." In re Rembert, 141 F.3d at 280-81 (citing Longo v. McLaren (In re McLaren), 3 F.3d 958, 961 (6th Cir.1993); Grogan

v. Garner, 498 U.S. 279, 291 (1991); and Manufacturer's Hanover Trust v. Ward (In re Ward ), 857 F.2d 1082, 1083 (6th Cir.1988)) (footnote omitted).

Wildwood's § 523(a)(2)(A) count is based upon its assertion that the Debtor misrepresented that he was an authorized member of Fusion when he signed the Lease. As noted earlier, the Court already granted partial summary judgment on this count with respect to some of the elements of § 523(a)(2)(A). Specifically, the Court found that the Debtor did obtain property from Wildwood, consisting of Wildwood's agreement to grant Fusion a lease for space in the Wildwood shopping center. The Court also found that the Debtor had obtained this property by means of a material misrepresentation. The material misrepresentation consisted of the Debtor's statement that he was an authorized member of Fusion. The Debtor was never a member of Fusion, let alone an authorized member. But the Court left for trial the following issues under § 523(a)(2)(A). Did the Debtor know that his representation that he was an authorized member of Fusion was false? Did the Debtor represent that he was an authorized member of Fusion with the intention of deceiving Wildwood? Did Wildwood justifiably rely upon the Debtor's representation that he was an authorized member of Fusion? Did Wildwood sustain damages as a proximate result of the Debtor's representation that he was an authorized member of Fusion?

After carefully considering all the testimony and documentary evidence in the record, the Court concludes that Wildwood has failed to prove by a preponderance of the evidence that the Debtor knew that his statement that he was an authorized member of Fusion was false at the time that he made that statement.

The Debtor professed some lack of knowledge about precisely what a member in a limited liability company actually is. The Debtor testified without contradiction that the only reason why

-13-

the two wives were identified in the Operating Agreement as the members was because Tahir insisted on it. More importantly, the Debtor testified credibly that he believed that he had the power to sign the Lease on behalf of Fusion. The Debtor's subjective belief is not without support. After all, the Debtor testified without contradiction that he was the individual who had negotiated Fusion's lease with Taubman for the Thai Masala restaurant at Great Lakes Crossing. Although Tahir testified that neither he nor his wife ever authorized the Debtor to sign any lease for Fusion, Tahir did not deny that the Debtor signed the lease documents on behalf of Fusion for the Thai Masala restaurant. Further, there are multiple communications in the record (exhibits I, J, K, L, M and N) that corroborate the Debtor's testimony and show that the Debtor was both the individual who negotiated that lease for Fusion, and signed modifications of the Thai Masala lease (exhibits I and K). Those communications do not establish that the Debtor was an authorized member of Fusion. He was not. But those communications do provide factual support for the Debtor's testimony that he sincerely believed he had the authority as a member of Fusion to enter into the Lease with Wildwood, based in part on what he had done with respect to the Great Lakes Crossing lease for Thai Masala.

Because the Court finds that the Debtor did not know that he was making a false statement regarding his authority to act as a member of Fusion, an essential element of a non-dischargeable debt under § 523(a)(2)(A) is not present. It necessarily follows then that the Debtor did not make the representation that he was an authorized member of Fusion with the intention and purpose of deceiving Wildwood. Therefore, another essential element of a non-dischargeable debt under § 523(a)(2)(A) is missing. Without these two essential elements, the Court need not reach the remaining elements regarding Wildwood's reliance on the Debtor's representation and regarding

the proximate cause of Wildwood's loss. The Court concludes that Wildwood has failed to prove by a preponderance of the evidence all of the elements of a non-dischargeable debt under § 523(a)(2)(A) of the Bankruptcy Code.

Section 523(a)(2)(B)

In count II, Wildwood seeks a non-dischargeable debt under § 523(a)(2)(B). Section 523(a)(2)(B) provides that a debt is not discharged in Chapter 7 if it is a debt

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by– . . .

(B) use of a statement in writing–

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive[.]

Wildwood's § 523(a)(2)(B) count is based upon its assertion that the Debtor misrepresented his assets, liabilities and net worth in the Application. When the Court granted partial summary judgment on this count, the Court found that the Debtor incurred the debt with Wildwood by the use of a materially false statement in writing regarding the Debtor's financial condition. The written statement consists of the Application. The Application was materially false because it listed assets that neither the Debtor nor Fusion had. It listed a net worth that neither the Debtor nor Fusion had. There were only two elements under § 523(a)(2)(B) that were left for trial. Did Wildwood reasonably rely upon the information contained in the Application? Did the Debtor make the

-15-

Application, with its materially false information regarding his financial condition, with intent to deceive Wildwood?

The Sixth Circuit Court of Appeals has held that, in determining reasonable reliance, a court should "consider[ ] all the facts and circumstances of the case . . . ." Martin v. Bank of Germantown (In re Martin), 761 F.2d 1163, 1166 (6th Cir. 1985). In In re Martin, the court considered the size of the loan compared to the debtor's net worth, prior dealings between the bank and the debtors, and that the bank obtained a credit report before making the loan. Id. at 1166-67. The Sixth Circuit has also followed the Seventh Circuit in holding that reasonable reliance is not "a rigorous requirement, but rather is directed at creditors acting in bad faith." In re Martin, 761 at 1165 (citing Northern Trust Co. v. Garman (In re Garman), 643 F.2d 1252, 1256 (7th Cir. 1980)). As explained in Garman, a court is not required

> to undertake a subjective evaluation and judgment of a creditor's lending policy and
> practices. . . . [Instead,] reasonableness is circumstantial evidence of actual reliance;
> that is, dischargeability shall not be denied where a creditor's claimed "reliance" on
> a "financial statement" would be so unreasonable as not to be actual reliance at all.

In re Garman, 643 F.2d at 1256.

There is uncontroverted testimony from George and Adam Nyman that they actually relied upon the Application. Both of them testified that the $250,000 cash and the substantial net worth shown on the Application were very important to Wildwood in making its decision to enter into the Lease with Fusion. But actual reliance is not by itself enough. As noted by the Sixth Circuit, the reliance must also be reasonable. On that point, the testimony and the other evidence in the record in this case are conflicting.

First, the Application, which is a form provided by Professional Property, on its face is a confusing form. It is titled "Application for Tenancy." That title suggests that it is intended to

-16-

reflect financial information about the prospective tenant – in this case, Fusion. But on the line for "Applicant," the Debtor's name is handwritten. Then the Application appears at various places to be requesting information about both a business entity and about an individual. In this case, that is somewhat of a problem, because George and Adam Nyman both testified that they viewed the Application as requiring financial information about the Debtor, not Fusion, although the Application does not mention anything about a personal guaranty of a prospective tenant's lease. The form is imprecise in describing *whose* assets and liabilities should be listed. The imprecision over *whose* assets and liabilities are to be listed in the Application, is exacerbated by the printed language above the signature line. It states that "Applicant acknowledges that submission of this information does not constitute an option or offer to lease but merely represents some of our understandings about a possible future lease and is not intended to create a legally binding obligation on the part of either party." This language too leaves open the question of whose assets and liabilities are required to be shown, and does not ask the signatory to provide any explanation. Was it the applicant's assets and liabilities (i.e., those of Fusion)? Or was it the assets and liabilities of someone who is being asked to sign a personal guaranty (i.e., the Debtor)?

George Nyman testified that he *assumed* that the assets and liabilities shown were those of the Debtor, because the Debtor signed on the bottom of the Application's third page. But George Nyman admitted that he never spoke to the Debtor about the information on the Application. The only discussions that took place about that information were discussions between LaKritz and the Debtor.

Second, even though George Nyman testified that there were three factors that were important to him in making the decision to grant Fusion a lease, two of those factors are not

-17-

mentioned at all in the Application: the fact that Fusion had an existing restaurant in Great Lakes Crossing and the Debtor's job with Chrysler. As for the first of these two factors, George Nyman testified that he did not know how long the Great Lakes Crossing restaurant had been operating before he signed the Lease on behalf of Wildwood. As it turned out, not long. The Lease was dated October 29, 2010, and George Nyman signed it on behalf of Wildwood on November 29, 2010. Yet Thai Masala had just opened for business in November, 2010. As for the second of these factors, Adam Nyman testified that the information concerning the Debtor's employment was obtained through LaKritz, not the Debtor. Finally, although George Nyman testified that he also recalled reviewing the Debtor's tax return before signing the Lease, Adam Nyman's testimony clarified that his father's recollection was mistaken. Neither of them even received the Debtor's tax return until February, 2011, well after the Lease was signed.

In these circumstances, where two of the most important facts relied upon by Wildwood were not even addressed in the Application, and where the Application itself was an imprecise form provided by Wildwood, it was simply not reasonable for Wildwood to accept all of the figures contained on the assets and liabilities page, and assume that those assets and liabilities all belonged to the Debtor, without asking the Debtor any questions, or even speaking with him. Even a minimal inquiry by George Nyman or Adam Nyman would have revealed why the Debtor put the figures on the Application and what he understood them to mean. But instead, Wildwood relied upon LaKritz to forward information, without ever speaking to the Debtor. Wildwood's reliance on the Application in these circumstances was not reasonable.

But even if the Court were to conclude that Wildwood's reliance upon the Application was reasonable, Wildwood failed to meet its burden to prove by a preponderance of the evidence that the

Debtor intended to deceive Wildwood. The Sixth Circuit Court of Appeals has explained that proof

of an intent to deceive for purposes of § 523(a)(2)(B) is not limited

> to include only a purely subjective intent to have another person rely on false
> financial statements . . . . In this circuit, [ ] section 523(a)(2)(B)(iv) is met if a debtor
> is reckless when submitting financial statements that he knows are not true, not only
> if the debtor possesses a subjective intent to deceive. As we said in *In re Martin*,
> 761 F.2d 1163, 1167 (1985), "[F]ull discharge may be disallowed if the debtor either
> intended the statement to be false, or the statement was grossly reckless as to its
> truth."

Investors Credit Corp. v. Batie (In re Batie), 995 F.2d 85, 90 (6th Cir. 1993).

Naturally, the Debtor testified that he never intended to deceive Wildwood. But, as In re

Batie explains, an intent to deceive may be inferred if a debtor is reckless when submitting financial

statements that he knows are not true. When the Debtor completed the Application in handwriting,

he listed assets that neither he nor Fusion had. Even allowing for the confusion in the form of the

Application, it is clear that neither Fusion, as the prospective tenant, nor the Debtor, as a potential

personal guarantor, had $250,000 cash, $1.5 million of cash surrender value of life insurance, or a

house worth $650,000. Discussing the Application only with LaKritz, and providing these figures

without more explanation, was undoubtedly careless. But was it reckless?

The Debtor testified credibly that, based upon his discussions with Tahir, he believed that

Tahir would make available $250,000 to Fusion over time to fund the development of four or five

restaurants for Fusion. That is why he placed that figure on the Application. As explained earlier,

despite Tahir's denial that he ever told the Debtor that he had $250,000, or that he would provide

$250,000 to Fusion, the Debtor's testimony about his belief does find support from other evidence

in the record. Tahir was the individual who put up the money for Thai Masala. Although he may

-19-

have been wrong in his belief, it was not unreasonable for the Debtor to have formulated a belief that Tahir would provide the money for a restaurant at Wildwood.

Moreover, the Debtor's testimony about what he told LaKritz is uncontroverted. The Debtor told LaKritz that he did not have $250,000 cash and, in fact, did not have any cash of his own to open a restaurant. The Debtor told LaKritz that Fusion could not open up a restaurant without money from Tahir and explained that Fusion could not have opened the Thai Masala restaurant at Great Lakes Crossing without Tahir's money. The Debtor also testified that it was only after conferring with LaKritz that he placed the $250,000 figure on the Application. Both George Nyman and Adam Nyman acknowledged that they never spoke to the Debtor at all before signing the Lease, and that they relied upon LaKritz for financial information regarding Fusion and the Debtor.

Obviously, it was a mistake for the Debtor to sign the Application without more of an explanation for why he used the figure of $250,000 cash that the Debtor readily admits that neither he nor Fusion had. But the issue for the Court is whether or not the evidence demonstrates that the Debtor had an intent to deceive, either subjectively or inferentially from a gross recklessness with respect to the information he provided. The Debtor may have been imprudent, or even foolish, in disclosing $250,000 cash on the Application without having written confirmation of such cash from Tahir. But the Court does not come away from the testimony with the impression that the Debtor intended the $250,000 figure to deceive Wildwood.

Similarly, the statement on the Application that there was life insurance with a cash surrender value of $1.5 million was unquestionably false. But what does this figure tend to show about the Debtor's intent? The Debtor testified without contradiction that he did have a life insurance policy with Chrysler that provided him with a death benefit of approximately $1.5 million, provided the

Court with a statement (exhibit R) evidencing this death benefit, and testified without contradiction that he is not knowledgeable about life insurance and the concept of cash surrender value. The Debtor further testified that he discussed this figure with LaKritz. The Debtor was undoubtedly careless, and again even foolish, in putting in the figure of $1.5 million without ascertaining the difference between death benefit and cash surrender value. But the record does not persuade the Court that this was done with an intent to deceive Wildwood.

The figure regarding the value of the Debtor's Home is somewhat more problematic. The Debtor did not have anything in writing to show that his home was worth $650,000, but had only an appraisal showing it worth $350,000. But the Debtor testified that he put the information on the Application after conferring with LaKritz, a real estate broker. There is nothing in the record to show that LaKritz, who was acting as a broker and agent for Wildwood, ever objected in any way to the Debtor using this value. It appears to the Court that the Debtor unrealistically overstated the value of his home. But by itself, this fact does not persuade the Court that the Debtor intended to deceive Wildwood.

The only other asset listed on the Application was the handwritten $200,000 of "Other Stocks and Bonds." But here the record does not show a false statement. The evidence demonstrates that the Debtor actually did have a 401(k) with Chrysler that did have an amount in it at the time of the Application approximating $200,000.

Although Wildwood focused almost exclusively on the asset side of the Application, it did make one point on the liability side. The Debtor listed "Bank of America" as his only credit card debt, with no account balance due. Wildwood argued that this was a false statement. However, the Debtor testified without contradiction that this was his only credit card, which he used sparingly,

and that he paid off any balance promptly. Because Wildwood did not prove that this was a false statement, it follows that this statement on the Application does not evidence an intent to deceive.

It is stating the obvious to say that the Application was not filled out with sufficient attention to detail. Taken together, the magnitude of the falsity of the figures set forth in the Application provides some evidence of an intent to deceive. But there is other, more probative evidence in the record that tends to show that the Debtor did not intend to deceive Wildwood. First, the evidence is uncontroverted that the Debtor discussed the contents of the Application with LaKritz, the broker for Professional Property and Wildwood, and explained the information to him, particularly regarding the $250,000 cash. Second, the Debtor plausibly explained his reasons for setting forth the $250,000 cash figure and the $1.5 million life insurance figure, although his explanation for the value of the Debtor's Home was admittedly less satisfactory. Third, it is hard to understand from the record what possible purpose the Debtor would have had to deceive Wildwood. After all, the Debtor and his wife signed, the Personal Guaranty, thereby ensuring that they would both be responsible personally for any unpaid indebtedness incurred by Fusion with Wildwood. In these circumstances, the economic motivation to deceive is significantly less than in circumstances where the Debtor would not have personal liability in the event of non-payment.

The Court considers this a close case. As explained, there is conflicting evidence both to support and refute a finding that the Debtor intended to deceive Wildwood. In determining whether there was an intent to deceive, the Court must also assess the Debtor's credibility. In so doing, it is important to note that the Debtor's demeanor did not suggest to the Court that he was deceitful. That does not mean that the Court does not accept the testimony of George Nyman and Adam Nyman. They too testified credibly. But the question here is one of the Debtor's intent. What

-22-

emerges from the record is that the Debtor is an individual who, although an engineer, is not a sophisticated business person. The Debtor wanted to become involved in the restaurant business and got in over his head. He acted on behalf of Fusion without having proper paperwork in place to allow him to do so. He filled out the Application without having a complete understanding of the information it was requesting, and having the benefit of assistance only from LaKritz, who was not his representative, but was instead the agent for Professional Property and Wildwood.

On balance, after carefully weighing the evidence, the Court finds that the Debtor did not intend to deceive Wildwood. The Debtor's completion of the Application was inadequate. But the Debtor's supplying of information in the Application was not, in light of the Debtor's testimony, sufficiently reckless to support a finding of an intention to deceive Wildwood. The Debtor intended that Wildwood believe what the Debtor himself believed, which turned out in large part not to be true. This is not deception. The Court concludes that Wildwood has failed to prove by a preponderance of the evidence all of the elements of a non-dischargeable debt under § 523(a)(2)(B) of the Bankruptcy Code.

### Conclusion

In sum, this was a failed business transaction, but that's all. The Debtor certainly made many mistakes, and paid for those mistakes with the Judgment entered against him. He was held fully responsible by the Judgment for his Personal Guaranty. It's unfortunate for the Debtor and Wildwood that it turned out the way it did. But the failure of this business transaction, and the Debtor's mistakes in the way that he handled this transaction, do not demonstrate a non-dischargeable debt. Accordingly, the Court will enter a judgment in favor of the Debtor and against

Wildwood, determining that the debt owed by the Debtor to Wildwood is a dischargeable debt, and

dismissing Wildwood's complaint with prejudice.

**FOR PUBLICATION**

.

```
Signed on January 03, 2014
                                    /s/ Phillip J. Shefferly
                              Phillip J. Shefferly
                              United States Bankruptcy Judge
```